UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
BRIAN CHENENSKY,                              :
individually and on behalf of all others
similarly situated,                           :

                    Plaintiffs,           :

          -against-                    :

NEW YORK LIFE INSURANCE                       :
COMPANY, et al.,
                           :
               Defendants.                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

07 Civ. 11504 (WHP)

MEMORANDUM & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/22/09

WILLIAM H. PAULEY III, District Judge:

        Plaintiff Brian Chenensky ("Chenensky") brings this collective and putative class

action against Defendants New York Life Insurance Company, New York Life Insurance and

Annuity Corporation, and NYLIFE Insurance Company of Arizona (collectively "New York

Life") for violations of the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 207 et seq., Title

12 of the New York Codes, Rules and Regulations ("NYCRR") § 142-2.2, and New York Labor

Law § 193.  New York Life moves for summary judgment dismissing this action.  For the

following reasons, New York Life's motion for summary judgment dismissing Chenensky's

overtime claims under the FLSA and the NYCRR is granted, and the motion for summary

judgment dismissing Chenensky's impermissible wage-deduction claim under New York Labor

Law is denied.

## BACKGROUND

### I.   New York Life Agents

New York Life is a mutual insurance company that offers life insurance,

annuities, and other financial products through individual agents. (Plaintiff's Responses to

Defendants' Rule 56.1 Statements of Material Facts dated July 2, 2009 ("Pl. 56.1 Stmt.") ¶ 1.)

From June 2003 to November 2006, Chenensky worked as a New York Life agent. (Pl. 56.1

Stmt. ¶ 2.)  He started as a "Pre-Training Allowance Subsidy" ("PTAS") agent, and New York

Life trained him in basic sales and product servicing. (Pl. 56.1 Stmt. ¶¶ 5-6.)  After he generated

$500 in commissions, New York Life reclassified Chenensky as a "Training Allowance

Subsidy" ("TAS") agent, and his relationship was governed by an Agent's Contract and 37-

month TAS Agreement addendum effective September 1, 2003. (Pl. 56.1 Stmt. ¶¶ 6-9.)

Chenensky obtained a license to sell traditional insurance and annuity products but never

received a license to sell securities, manage assets, or work as a certified financial planner. (Pl.

56.1 Stmt. ¶¶ 3-4.)

The Agent's Contract provided that Chenensky would be treated as an

independent contractor who could work any hours he chose and would be paid a commission

based on his sales activity and not the number of hours he worked. (Declaration of Sean P.

Lynch dated May 21, 2009 ("Lynch Decl.") Ex. D: Agent's Contract Effective Sept. 1, 2009

("Agent's Contract") ¶ 5.)

On September 30, 2006, when the TAS period expired, the Agent's Contract alone governed Chenensky's affiliation with New York Life, and Chenensky became an Established Agent. Chenensky resigned from New York Life on November 10, 2006. (Pl. 56.1 Stmt. ¶ 15.)

Throughout his tenure at New York Life, Chenensky's job responsibilities included insurance sales, customer recruitment, fact-finding, and customer advising. (Pl. 56.1 Stmt. ¶¶ 16-18, 21.) As part of his responsibilities, Chenensky wrote insurance policies and riders and several types of annuities. (Pl. 56.1 Stmt. ¶ 40.) Chenensky attended weekly performance reviews and training sessions covering, inter alia, sales techniques and advice to customers. (Pl. 56.1 Stmt. ¶¶ 8-9.) New York Life utilizes the "Counselor Salesperson" model which teaches agents to focus on "developing trust with clients," ask questions "to truly understand [] both the client's needs and wants," and "serve as an advocate for the client." (Pl. 56. 1 Stmt. ¶ 21.) Agents are taught to "strengthen the relationship with the client" after the sale through servicing and follow-up. (Pl. 56.1 Stmt. ¶ 21.)

New York Life also teaches its agents to follow six steps for success in the "life insurance sales cycle" (the "Sales Cycle"). (Pl. 56.1 Stmt. ¶¶ 22-25; Lynch Decl. Ex. O: Career Orientation Project 200: Identifying Your Initial Markets dated May 22, 2003 ("Project 200") at 1.) While those steps are explicated at length in New York Life training materials, they are summarized below:

> (1) Prospecting: includes finding new individuals or businesses ("prospects") who might be interested in New York Life products. (Pl. 56.1 Stmt. ¶ 26.) While prospecting, Chenensky spoke with friends and acquaintances, set up tables at bridal shows, baby shows, and street fairs, and visited community groups and businesses. (Pl. 56.1 Stmt. ¶¶ 27, 95.)

-3-

(2) <u>Approaching prospective clients</u>: includes introducing oneself to prospects. New York Life taught Chenensky to explain who he was and what he did and to break the ice with the prospect. (Pl. 56.1 Stmt. ¶ 30.)

(3) <u>Fact-finding</u>: includes gathering information about a prospect's financial situation and goals. Based on this information, Chenensky determined which New York Life products suited the prospect's price range and needs. (Pl. 56.1 Stmt. ¶ 34.) New York Life likened fact-finding "to a doctor who takes a patient's medical history as part of the process of diagnosing an illness." (Declaration of Adam C. Mayes in Opposition to Defendants' Motion for Summary Judgment dated July 2, 2009 ("Mayes Decl.") Ex. 20: Guide to the Sales Process at 6.)

(4) <u>Presenting the solution</u>: includes identifying those New York Life products that best suit the needs of the prospect and communicating those findings. (Pl. 56.1 Stmt. ¶¶ 39-40.) Chenensky helped clients understand how the recommended product or service would help them meet their financial needs. (Pl. 56.1 Stmt. ¶ 41.)

(5) <u>Closing</u>: includes obtaining a prospect's commitment to purchase the recommended products. (Pl. 56.1 Stmt. ¶ 43.) Chenensky assisted the customer in completing and submitting necessary paperwork. (Pl. 56.1 Stmt. ¶ 43.)

(6) <u>Delivery and continuing service</u>: includes physical transfer of the policy to the customer and maintaining an ongoing relationship. (Pl. 56.1 Stmt. ¶¶ 44-46.) After a policy issued, Chenensky could change the beneficiary and receive credit for any additional sales derived from the service provided to existing policies. (Pl. 56.1 Stmt. ¶ 47.)

Chenensky worked alone and spent most of his time in the field, not in a New York Life office. (Pl. 56.1 Stmt. ¶¶ 91-92.) He scheduled his own appointments and worked the hours he wanted. (Pl. 56.1 Stmt. ¶¶ 84-85.) He met prospects and clients in their homes or at their places of business. (Pl. 56.1 Stmt. ¶ 93.) Chenensky also made phone calls to prospective customers, prepared sales presentations, and completed paperwork related to his activities with

clients. (Pl. 56.1 Stmt. ¶ 96.)

Chenensky's compensation was based entirely on commissions—he received no salary or hourly wage. (Pl. 56.1 Stmt. ¶ 100.) To maintain his affiliation as an agent, Chenensky was required to meet minimum sales levels: $500 per month in commissions the first year; $750 in the second year; and $1000 in the third year. (Pl. 56.1 Stmt. ¶¶ 87-90.)

## II. New York Life's Ledger System

New York Life agents are paid through a "ledger-based compensation system." (Pl. 56.1 Stmt. ¶ 97.) Each ledger reflects credits and debits for the agent's account. (Pl. 56.1 Stmt. ¶ 97.)

Credits were posted to Chenensky's ledger when New York Life received a premium on a policy that he sold. (Pl. 56.1 Stmt. ¶¶ 100-101.) Additionally, Chenensky received credits for a commission-based training allowance (the Training Allowance Subsidy), incentive-based bonuses, renewal commissions, and expense allowance payments—all in some way derived from the sale of New York Life products. (Pl. 56.1 Stmt. ¶¶ 100-102.) New York Life also posted annualized commission credits to Chenensky's ledger. Thus, when Chenensky's customers paid the first month's premium, New York Life advanced the full first-year commission on that policy to Chenensky. (Pl. 56.1 Stmt. ¶ 104.) Commission credits could be reversed for certain reasons—for example, if a customer decided to cancel a policy within the first ten days, New York Life refunded the premium paid to the customer and deducted the commission from an agent's ledger. (Pl. 56.1 Stmt. ¶¶ 105-107.)

Ledger debits were posted for expenses associated with an agent's liability

-5-

insurance, computer support, telephone service, and office space. (Pl. 56.1 Stmt. ¶¶ 112-113.)

Chenensky was required to enroll in the Professional Liability Insurance Program during his first

contract year. (Pl. 56.1 Stmt. ¶ 116; Lynch Decl. Ex. G: Agent Guidelines dated May 15, 2003

("Guidelines") at *1.) New York Life prepays the annual premium and thereafter debits the

agent's ledger "in four equal consecutive monthly installments until the total amount is repaid to

New York Life." (Pl. 56.1 Stmt. ¶ 116; Lynch Decl. Ex. SS: 2004-2005 Enrollment Form for

Professional Liability Insurance dated July 27, 2004.) Chenensky also enrolled in New York

Life's Field Technology Program. (Pl. 56.1 Stmt. ¶ 114; Guidelines at *3.) For these services,

New York Life charged him $35 on the first business day of each calendar month. (Guidelines at

*3; Mayes Decl. Ex. 38: Field Technology Agreement.) Chenensky also subscribed to a

Telephone Equipment and Service Agreement under which New York Life applied debits to the

ledger "each month for telephone equipment and service allotted to [the agent]." (Pl. 56.1 Stmt.

¶ 115; Lynch Decl. Ex. RR: Telephone Equipment and Service Agreement dated Sept. 4, 2003.)

Finally, Chenensky executed a Rental Agreement pursuant to which he agreed to lease space in

New York Life's general office, taking a ledger debit on the first business day of each month.

(Pl. 56.1 Stmt. ¶ 117; Lynch Decl. Ex TT: Rental Agreement dated Dec. 31, 2004, at *1.).

New York Life reports all ledger credits to the Internal Revenue Service as

taxable income for its agents. (Pl. 56.1 Stmt. ¶ 97.) Only debits reflecting pre-tax deductions,

such as 401K and deferred compensation plan contributions, are offset from this amount. (Pl.

56.1 Stmt. ¶ 97.) Twice per month, New York Life paid Chenensky the net of credits and debits

posted to his ledger. (Pl. 56.1 Stmt. ¶ 119.) During his tenure, Chenensky never objected to the

ledger system apart from a single request involving an erroneous debit. (Pl. 56.1 Stmt. ¶ 122.)

-6-

DISCUSSION

I.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Davis v. Blige, 505 F.3d 90, 97 (2d Cir. 2007).  The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  Once the moving party has made the initial showing that there is no genuine issue of material fact, the non-moving party cannot rely on the "mere existence of a scintilla of evidence" to defeat summary judgment but must set forth "specific facts showing that there is a genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original); Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (citation omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Scott v. Harris, 550 U.S. 372, 380 (2007) (citing Matsushita, 475 U.S. at 586-87).  The Court resolves all factual ambiguities and draws all inferences in favor of the non-moving party.  Liberty Lobby, 477 U.S. at 255; Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005).


II.  The FLSA and State Law Overtime Claims

The FLSA imposes standards on employers to promote "the health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a).  The FLSA includes an "overtime

-7-

requirement" that employers pay employees "a rate not less than one and one-half times the

regular rate at which he is employed" for hours worked in excess of forty per week. 29 U.S.C. §

207(a)(1). The overtime requirement has numerous exemptions, primarily for workers who

"typically earn[] salaries well above the minimum wage . . . and . . . [are] presumed to enjoy

other compensatory privileges." In re Novartis Wage & Hour Litig., 593 F. Supp. 2d 637, 643

(S.D.N.Y. 2009). Section 213(a)(1) of the FLSA exempts "any employee employed . . . in the

capacity of an outside salesman," as regulated by the Secretary of Labor.

    "The Secretary[] [of Labor's] regulations have the force of law, and are to be

given controlling weight unless they are found to be arbitrary, capricious, or manifestly contrary

to the statute." Freeman v. Nat'l Broad. Co., Inc., 80 F.3d 78, 82 (2d Cir. 1996) (internal

citations omitted). Under these regulations, an outside salesperson is defined as an employee:

> (1) Whose primary duty is: (i) making sales within the meaning of
> Section 3(k) of the Act; or (ii) obtaining orders or contracts for
> services or for the use of facilities for which a consideration will be
> paid by the client or customer; and
> (2) Who is primarily and regularly engaged away from the
> employer's place or places of business in performing such primary
> duty.

29 C.F.R. § 541.500(a) (emphasis added). "Sales" or "sell" under this section is broadly defined

and "includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or

other disposition." 29 U.S.C. § 203(k). Work performed "incidental to and in conjunction with

the employee's own outside sales or solicitations . . . [and] . . . work that furthers the employee's

sales efforts shall be regarded as exempt work, including, for example, writing sales reports,

updating or revising the employee's sales or display catalogue, planning itineraries, and

attending sales conferences." 29 C.F.R. § 541.500(b).

-8-

Determining an employee's "primary duty" means identifying "the principal, main, major, or most important duty that the employee performs." 29 C.F.R. § 541.700. The question of how an employee spends his time working is one of fact, but the question of whether those activities exempt him from the FLSA is one of law. See Icicle Seafoods v. Worthington, 475 U.S. 709, 714 (1986). Moreover, "exemptions to the FLSA are 'narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit.'" Bilyou v. Dutchess Beer Distrib., Inc., 300 F.3d 217, 222 (2d Cir. 2002) (citing Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960)).

Courts applying the outside salesperson exemption consider whether sales are made by the employee but also look for hallmark activities including (1) whether the employee generates commissions for himself through his work, (2) the level of supervision of the employee, (3) the amount of work done away from the employer's place of business, (4) whether the employee independently solicits new business, and (5) the extent to which the employee's work is unsuitable to an hourly wage. See 29 C.F.R. § 541.700; In re Novartis, 593 F. Supp. 2d at 648-49 (holding pharmaceutical representatives exempt); see also Schmidt v. Eagle Waste & Recycling, Inc., 598 F. Supp. 2d 928, 932 (W.D. Wis. 2009) (exemption requires "only that an employee be away from the office when conducting her primary duties").

New York law governing overtime pay is defined and applied in the same manner as the FLSA and includes an exemption for outside salespersons. 12 NYCRR §§ 142-2.2, 142-2.14(c)(5); see also In re Novartis, 593 F. Supp. 2d at 646-47 (citing Galasso v. Eisman, Zucker, Klein, & Ruttenburg, 310 F. Supp. 2d 569, 575 (S.D.N.Y. 2004)).

While Chenensky offers narrative from training brochures and New York Life

-9-

advertisements about his perceived role as a counselor and advisor, the evidence plainly shows that Chenensky's primary duty at New York Life was to sell insurance. There is no issue of disputed fact regarding Chenensky's workday—it was the six-step Sales Cycle where Chenensky solicited new business, presented available products to prospects, obtained a commitment to purchase, and ultimately received a commission-based salary. See, e.g., Gregory v. First Title of Am., Inc., 555 F.3d 1300, 1301, 1309-10 (11th Cir. 2009) (affirming summary judgment for title insurance company whose "marketing executive" received commission-based pay for orders for title insurance). Although Chenensky submits that activities like "fact-finding" and "presenting the solution" made his work administrative, these steps were merely incidental to consummating the deal. See 29 C.F.R. § 541.500(b) ("Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."); In re Novartis, 593 F. Supp. 2d at 651-52 (defining "sales" within Section 3(k) of the FLSA to include "'obtain[ing] a commitment to buy' from the customer").

Moreover, Chenensky's arguments are undermined by his commission-based compensation. Notably, at oral argument, Chenensky's counsel acknowledged that Chenensky would not have received any wages from New York Life had he only advised clients or maintained good relationships with customers. Chenensky's progression from PTAS to TAS and then to Established Agent depended on meeting sales benchmarks, not on doling out advice. See Schmidt, 598 F. Supp. 2d at 935-36 ("[Exempt employee] did not merely promote defendant's business; she had a duty and an incentive to pursue new clients as a means of increasing her own compensation."). Chenensky's advice did not alone earn commissions for him—it was simply one mark of a good salesman.

-10-

Apart from the fact that selling was his primary duty, Chenensky spent a majority of his time <u>outside</u> of the New York Life office, free from a manager's day-to-day supervision. <u>See</u> 29 C.F.R. §§ 541.500(a)(2), 541.700 (considering "employee's relative freedom from direct supervision"); <u>Gregory</u>, 555 F.3d at 1308 (factoring "time . . . spent away from the office"). Chenensky attended fairs and bridal shows to troll for business. He managed his appointment calendar and worked the hours he chose. Chenensky met with supervisors only once a week during his training period. Overall, he had significant discretion over the content and structure of his worklife. <u>See In re Novartis</u>, 593 F. Supp. 2d at 641-42 ("[Pharmaceutical] reps have discretion as to when and how they deploy [their advertising materials]. Reps plan their daily call schedules and decide when to visit each doctor on their target list.").

Finally, Chenensky's argument that a recent Opinion Letter by the U.S. Department of Labor classifies his work as administrative is unavailing. <u>See</u> Opinion Letter FLSA2009-28 from Alexander J. Passantino, Acting Director, Dept. of Labor (Jan. 16, 2009), <u>available at</u> http://www.dol.gov/whd/opinion/FLSA/2009/2009_01_16_28_FLSA.pdf. First, Department of Labor Opinion Letters "do not have the force of law, but . . . 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" <u>In re Novartis</u>, 539 F. Supp. 2d at 643 n.4 (citing <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944)). Second, the guidance from this letter reinforces that Chenensky was a salesman and not an office administrator. The letter identifies "administrative" insurance agents as "perform[ing] office or non-manual work related to the management or general business operations of the employer . . . [and engaging] . . . in promotion and business development activities, including the marketing, servicing, and promoting of the firm's . . . products." <u>See</u>

-11-

Opinion Letter FLSA2009-28, at 6-7. These administrative skills are explicitly linked in the

letter to an "office" and to company "management." In contrast, Chenensky's work took him out

of the New York Life office, away from management, and away from other employees. There is

no suggestion he oversaw other employees or aided the management framework of New York

Life.

　　　　　Accordingly, Chenensky qualified as an exempt outside salesperson, and New

York Life's motion for summary judgment with respect to both the FLSA and the NYCRR

claims is granted.


III. Deductions From Wages

　　a. New York Labor Law § 193

　　　　　Under New York law, employers are prohibited from making "any deduction

from the wages of an employee" unless "in accordance with the provisions of any law or any rule

or regulation issued by any governmental agency" or "expressly authorized in writing by the

employee" for "insurance premiums, pension or health and welfare benefits, contributions to

charitable organizations, payments for United States bonds, payments for dues or assessments to

a labor organization, and similar payments for the benefit of the employee." N.Y. Lab. Law §

193(1)(a-b); see also Pachter v. Bernard Hodes Group, Inc., 891 N.E.2d 279, 283-84 (N.Y.

2008). Where an employer makes deductions from an employee's final compensation that are

outside the enumerated categories in Section 193, their legality depends on the timing of the

deduction. See Pachter, 891 N.E.2d at 284. Where an employee is paid by commission, Section

193 does not prohibit deductions "if [they] were made before the commissions were earned."

-12-

Pachter, 891 N.E.2d at 284. However, when the deductions are made after the employee earns

his commission, Section 193 bars them. Pachter, 891 N.E.2d at 284; see also Gennes v. Yellow

Book of N.Y., Inc., 806 N.Y.S.2d 646, 647 (N.Y. App. Div. 2005) (finding Section 193 violation

where deductions from commissions were taken for failure to renew subscriptions).

     An employer and employee can agree about the point in time when a commission

becomes "earned" and, therefore, a "wage." Pachter, 891 N.E.2d at 285. Absent such

agreement, courts apply the New York rule that a commission is earned when "a ready, willing

and able purchaser of services" is produced. Pachter, 891 N.E.2d at 284-85 (citing Srour v.

Dwelling Quest Corp., 842 N.E.2d 13 (N.Y. 2005) (citation omitted)). When a salesman's

efforts result in a client's commitment to purchase, the commission is earned regardless of

whether payment is made or a service delivered. Pachter, 891 N.E.2d at 284-85.

     New York Life does not dispute that the debits applied to an agent's ledger are

outside the scope of allowable deductions for an employee's benefit under Section 193. Because

the deductions are beyond the pail, they are permissible only if New York Life and Chenensky

agreed that the deductions could be taken before the commission was "earned." Pachter, 891

N.E.2d at 284.

     b. Agreement

     Whether the parties had an express or implied agreement is a matter of contract

interpretation which is a question of law for the court to decide. K. Bell & Assocs., Inc. v.

Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir. 1996); R/S Assocs. v. N.Y. Job Dev. Auth., 771

N.E.2d. 240, 242 (N.Y. 2002). A court first determines if the agreement is ambiguous, mindful

that extrinsic evidence is inadmissible to create an ambiguity. See Duane Reade Inc. v. St. Paul

-13-

Fire & Marine Ins. Co., 411 F.3d 384, 390 (2d Cir. 2005); Readco Inc. v. Marine Midland Bank,
81 F.3d 295, 299 (2d Cir. 1996) (citation omitted).  "Where the language used is susceptible to
differing interpretations, each of which may be said to be as reasonable as another, and where
there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words
become[s] an issue of fact and summary judgment is inappropriate."  Seiden Assocs., Inc. v.
ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992) (citations omitted).

   Several related agreements between New York Life and Chenensky address the
credits and debits to Chenensky's ledger.  However, considered together, the documents do not
disclose a definite meaning concerning the timing of debits relative to credits.

   The Agent's Contract yields no clear answer.  Section 18 states that "New York
Life shall pay to the Agent . . . commissions on premiums received by New York Life under
[policies] issued as a result of applications obtained by the Agent while the Agent's Contracts is
in force."  Although Section 18 discusses the payment of commissions, it does not illumine the
point in time when the commissions are earned.  Section 9 concerns debiting and states that
"New York Life is hereby given a paramount and prior lien upon all compensation payable . . .
as security for the payment of any claim or indebtedness or reimbursement whatsoever due . . . to
New York Life from the Agent."  By placing a lien on compensation that is payable, New York
Life appears to be debiting monies already earned.

   Moreover, the language in the TAS Agreement addendum does not dispel the
uncertainty.  Sections 7 and 9 of the addendum state, inter alia, that an agent's ledger could be
debited if a policyholder's premium was refunded or if a policyholder misrepresented material
facts in his application.  While these sections may buttress New York Life's argument that the

-14-

commission was not earned at the time a ready and willing buyer was located, they do not address the actual timing of debits for insurance, phone, and other expenses.

Finally, the language of the side agreements allowing debits for office expenses is inconsistent. For example, technology fees and office rent were debited on the first business day of the month, but the telephone service agreement does not specify a date for the deduction. Similarly, no provision specifies the day of the month that an agent's ledger is debited for liability insurance.

Because none of the documents address the earning of credits and the timing of deductions in a comprehensive way, Chenensky's contract is ambiguous. Such a factual issue cannot be resolved on summary judgment. Perhaps recognizing this, the parties submitted significant conflicting extrinsic evidence on the parties' course of dealings. That contradictory evidence cannot be reconciled at this stage. Accordingly, New York Life's motion for summary judgment with respect to Chenensky's New York Labor Law § 193 claim is denied.

## CONCLUSION

For the foregoing reasons, New York Life's motion for summary judgment on

Chenensky's claims under the FLSA, 29 U.S.C. § 207 et seq., and 12 NYCRR § 142-2.2 is

granted. However, New York Life's motion for summary judgment on the New York Labor

Law § 193 claim is denied.

This Court recognizes that the dismissal of the federal claim may deprive it of

jurisdiction in this matter. This Court will hold a conference to discuss this issue on January 29,

2010, at 10:45 a.m. The parties shall submit letters addressing this jurisdictional by January 22,

2010.

Dated: December 22, 2009
       New York, New York

                                        SO ORDERED:


                                        WILLIAM H. PAULEY III
                                        U.S.D.J.


*Counsel of record:*

John Halebian, Esq.
Lovell Stewart Halebian, LLP
500 Fifth Avenue
New York, NY 10110
*Counsel for Plaintiff*

Richard G. Rosenblatt, Esq.
Morgan, Lewis & Bockius, LLP
502 Carnegie Center
Princeton, NJ 08540
*Counsel for Defendant*s

-16-