UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRIAN CHENENSKY, individually, and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>NEW YORK LIFE INSURANCE CO., NEW YORK LIFE INSURANCE AND ANNUITY CORP., NY LIFE INSURANCE CO. OF ARIZONA, JOHN DOES 1-50 (said names being fictitious individuals), and ABC CORPORATIONS 1-50 (said names being fictitious companies, partnerships, joint ventures and/or corporations),<br><br>    Defendants. | 1:07-cv-11504 (WHP)<br><br>*Electronically Filed* |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
MOTION OF DEFENDANTS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

I.  PRELIMINARY STATEMENT ................................................................................ 1

II. ARGUMENT ........................................................................................................... 1

    A.  Chenensky Does Not Raise Any Material Fact In Dispute .................................... 1

    B.  The TAS Agreement Confirms Compensation Was The Net On The
Ledger ................................................................................................................ 2

    C.  The "Central Fact" Chenensky's Relies Upon To Distinguish Pachter Is A
Fiction, Leaving No Meaningful Difference Between This Case and
Pachter ............................................................................................................... 3

    D.  Chenensky's Argument That He Signed The Expense Enrollment
Agreements After His Agent Contract And TAS Agreement Is A Red
Herring ............................................................................................................... 6

    E.  Defendants' Position Comports With The Parties' Course of Performance .......... 7

    F.  Chenensky's Tax Treatment And Debt Recompense Arguments Do Not
Preclude Summary Judgment To New York Life ................................................. 9

III. CONCLUSION ....................................................................................................... 10

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

Adasar Grp., Inc. v. Netcom Solutions Int'l, Inc.,
    No. 01-0279, 2003 WL 1107670 (S.D.N.Y. Mar. 13, 2003) ...................................................... 8

Chenensky v. New York Life Ins. Co.,
    No. 07-11504, 2009 WL 4975237 (Dec. 22, 2009) ................................................................. 5

Consarc Corp. v. Marine Midland Bank, N.A.,
    996 F.2d 568 (2d Cir. 1993) ..................................................................................................... 6

Gold v. New York Life,
    No. 09-3210, 2011WL 2421281(May 19, 2011) ..................................................................... 5

JA Apparel Corp., v. Abboud,
    682 F. Supp. 2d 294 (S.D.N.Y. 2010) ...................................................................................... 8

New Windsor Vol. Ambulance Corps, Inc. v. Meyers,
    442 F.3d 101 (2d Cir. 206) ....................................................................................................... 8

Pachter v. Bernard Hodes Grp.,
    10 N.Y.3d 609 (2008) ....................................................................................................... passim

Pachter v. Bernard Hodes Grp.,
    541 F.3d 461 (2d Cir. 2008) ..................................................................................................... 4

This Is Me, Inc. v. Taylor,
    157 F.3d 139 (2d Cir. 1998) ..................................................................................................... 5

**STATUTES**

N.Y. Ins. Law § 4228 ................................................................................................................. 6, 10

New York Labor Law § 193 ........................................................................................................ 1,10

**OTHER AUTHORITIES**

Restatement (Second) Contracts § 203(a) ....................................................................................... 6

I.  **PRELIMINARY STATEMENT**

Chenensky's opposition, while long on selective, out-of-context snippets from cherry-picked agreements, glaringly fails to mention Chenensky's actual testimony where he unambiguously admitted that he understood that credits and debits would be reconciled on his ledger to determine his periodic compensation.  That testimony unmistakably proves that Chenensky's compensation understanding was in complete accord with that of New York Life.  Only one factual conclusion is possible:  New York Life paid Chenensky what he was promised without any deductions violative of Section 193.  In this regard, New York Life urges the Court to ask Plaintiff two simple questions:  **(1) Where in the voluminous record is there any evidence to suggest that Chenensky did not understand that his compensation was the net of credits and debits reconciled on his ledger?  and (2) What question is left for a jury to decide?  The answers are "nowhere" and "none."**

Chenensky is not really arguing that he did not fully understand his compensation.  He understood it.  Rather, Chenensky seeks to indict New York Life's decades-old compensation system as *per se* illegal.  The most obvious problem with that argument is that New York Life's compensation system mirrored Pachter's in all material respects.  The Court should retain jurisdiction for the purpose of putting an end to this five-year old case.

II.  **ARGUMENT**

    A.  **Chenensky Does Not Raise Any Material Fact In Dispute.**

A review of Chenensky's response to New York Life's Rule 56.1 Statement (Dkt. # 158) demonstrates no dispute as to the facts set forth in 22 of the 28 paragraphs.  As to the remaining six, though he used the word "disputed," Chenensky either previously admitted the facts therein (compare Dkt. #158, ¶¶ 20, 22, 23, 28 and Dkt. #37, ¶¶ 107, 109, 110, 122) and/or he cites no record facts to justify his assertion.  He simply cannot dispute that he understood (i) his

compensation would be the net of credits and debits applied to his ledger; (ii) annualized commissions were not earned; and (iii) New York Life paid him all it promised. SOF ¶¶ 4-30.

So where do Chenensky and his lawyers go next? First, they argue that New York Life's "The Opportunities Program" Manual contradicts New York Life's contention that the parties understood the existence of the ledger-based reconciliation system. (Pl. Br. p. 6). Specifically, Chenensky argues that since that single document – which is not among any of the agreements he signed – does not mention debits, it somehow supersedes his enrollment agreements and all of the references to debits and credits in his Agent Contract and TAS Agreement. The problems with that argument are obvious. It is an argument created by Chenensky's counsel that contradicts Chenensky's own testimony. Moreover, it is undisputed that the purpose of the "The Opportunities Program" Manual was to describe how the Company calculates **credits** applied to the ledger. It was only one part of the **compensation** calculation. It was not the vehicle through which New York Life communicated about the various debits or how it reconciled the items on the ledger credits to determine an agent's **compensation**. Hynes dep. 68:19-69:22, Exh. A to Lynch Reply Decl. New York Life explained the expense debits elsewhere, including in various enrollment agreements signed by Chenensky. Id., 191:8-19. The "patchwork of several agreements" that Chenensky did sign makes inescapably clear that he agreed that his compensation would be the product of reconciling credits and debits.

      **B.**      **The TAS Agreement Confirms Compensation Was The Net On The Ledger.**

In his opposition, Chenensky highlights paragraph 9(b) of the TAS Agreement and argues it is the only provision substantively addressing the ledger-based compensation system. Even if that assertion were correct, it begs one question: "So what?" There is no tenet of contract law that requires a provision to be stated more than once before it takes effect. In any event, other provisions in the TAS Agreement further demonstrate that the ledger was the

foundation for determining Chenensky's periodic pay.  For example, ¶ 7 states:

> **For purposes of crediting commissions to the Agent's ledger**, and determining the amount of "Net Eligible First Year Commissions" (as defined in Section 9 below) to be used in calculating the amount of a Commission Based Training Allowance payment, the following annualization and commission rules apply…

Dkt. # 142-1, Exh. B at ¶ 7 (emphasis added).

The other references in the TAS Agreement to items being "payable" or "earned" (selectively culled by Chenensky) follow the above qualifying language and fall within the "for purposes of crediting commissions the Agent's ledger" umbrella.  That language is entirely consistent with "payable" commissions being compensation components – items posted to the ledger reconciled against other credits and debits to determine periodic compensation.  Chenensky's TAS Agreement also specifically provides that New York Life "will debit the Agent's ledger" in the event that the Company rescinds a policy or a policy lapses before the full first year premiums are paid.  TAS Agreement, ¶ 7, Dkt. # 142-1, Exh. B.[1]

### C. The "Central Fact" Chenensky's Relies Upon To Distinguish <u>Pachter</u> Is A Fiction, Leaving No Meaningful Difference Between This Case and <u>Pachter</u>.

Faced with this undisputed record, Chenensky essentially concedes that he knew his compensation in a given pay period would be the net on his ledger.[2]  Yet, he proceeds to argue that New York Life's ledger system is *per se* illegal under Section 193.  How does he get there?

First, Chenensky attempts to distinguish <u>Pachter</u> by contending it involved "definitive

---

[1] Chenensky's suggestion that New York Life should have established the ledger in the Agent's Contract is much ado about nothing.  The TAS Agreement "is a supplement to and modifies the Agent's Contract."  <u>Id.</u>, ¶ 1.  They are one.  Also, ¶ 1 of the TAS Agreement specifies that any provisions in the Agent's Contract that is contrary to the TAS Agreement is "ineffective and inapplicable and the provisions of [the TAS] Agreement will be controlling."  Thus, any perceived inconsistency with language in the Agent's Contract is meaningless.

[2] Chenensky has testified and represented to the Court that he understood that advanced/annualized commissions remained subject to reversal if the premiums were not paid, such that they are not "earned." <u>See e.g.</u>, Chenensky dep., 213:21-216:14; Chenensky Mtn. to Amend Reply, Dkt. #89 ("When New York Life reverses annualized commission credits, it often re-credits the agent with the commissions that were already earned.… As Plaintiffs stipulated, they do not challenge such reversals, which are limited to advanced rather than earned commissions."); 56.1 Rspns. ¶ 106, Dkt. #34 ("Plaintiff understood that he became entitled to commissions when New York Life received the underlying premium."); December 22, 2010 oral argument tr. 21:22-22:8, Exh. C to Lynch Reply Decl. ("Our position is that a commission is earned when a premium is paid, okay?").

monthly earnings statements" and that the commission credits reflected on that monthly balance paid to Pachter were never subject to later reversal. (Pl. Br. p. 3, 17). That is flat wrong.

In Pachter, the employer ("Hodes") credited commissions in one month, while reserving the right to reverse those commissions in a later month. Pachter v. Bernard Hodes Grp., 10 N.Y.3d 609, 612 (2008). For example, if Pachter sold $2,000 worth of advertising to XYZ Company in January for which she qualified to receive a 50% commission, Hodes applied the 50% commission formula and entered a $1,000 commission credit on her January ledger. At the end of January, Hodes added the XYZ Company commission to any other commissions and other production credits generated in January to arrive at "Total Income" on Pachter's ledger statement.[3] Id. Hodes then adjusted Pachter's January "Total Income" by debiting "Charges" for business expenses to arrive at the dollar amount payable to Pachter as her January compensation. Id.; Dkt. #142, Exh. M.

If, later, XYZ Company failed to pay Hodes, the commissions previously paid to Pachter became a "Bad Debt." Hodes would apply a $1,000 Bad Debt charge on a subsequent month's ledger corresponding to the commission credit applied in January. Pachter, 10 N.Y.3d at 612. The later debit would reduce net earnings in the later month when applied to the ledger. Pachter held that such "Charges" imposed by Hodes were perfectly lawful because the parties understood that Hodes would apply credits and negative adjustments to reach Pachter's periodic compensation. Pachter v. Bernard Hodes Grp., 541 F.3d 461 (2d Cir. 2008).

This practice is precisely the same as New York Life's ledger-based reconciliation system. As explained above, Chenensky's effort to distinguish this case from Pachter by focusing exclusively on the "The Opportunities Program" manual – ignoring the Agent Contract, TAS Agreement and the various enrollment agreements – is misplaced. The Court already has

---

[3]  A sample of Pachter's ledger is Exh. M (Dkt. # 142) and replicated at New York Life's opening brief at page 19.

- 4 -

held that Chenensky's compensation arrangement is a "patchwork of several agreements" that set forth not just ledger credits, but also ledger debits in the form of reversals and expenses. Chenensky v. New York Life, No. 07-11504, 2009 WL 4975237 at *8 (Dec. 22, 2009) ("several related agreements"); Gold v. New York Life, No. 09-3210, 2011 WL 2421281, *6 (May 19, 2011) ("patchwork of written agreements"); see also, e.g., This Is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998) ("Under New York law, all writings forming part of a single transaction are to be read together."). Those agreements establish that Chenensky agreed that his commission credits were subject to offset and reversal dependent upon future conditions.

The Court is well aware that there is a dispositively meaningful difference between the concept of a commission credit being payable and the concept of the credit being the employee's final compensation. The material issue is whether the parties agreed that downward adjustments would be applied to such credits to determine periodic compensation. See Dkt. # 110, 2012 WL 234374, at *5 (S.D.N.Y. Jan. 10, 2012). So while a commission credit may have been payable, the parties to a commissioned-based compensation system may freely agree that those credits remain subject to downward adjustment or reversal in the ledger reconciliation process. And, here, the Court need look no further than Chenensky's own testimony to realize that just such an agreement was reached:

> Q. Did you understand that if you sold a product that you would get a commission, right?
> A. Yes.
> Q. And that commission would be placed on the ledger, correct?
> A. Yes.
> Q. And you also understood that certain expenses such as the telephone expense would be debited to the ledger, correct.
> A. Yes, I believe so, yes.

Chenensky dep. 212:20-213:7, Exh. B to Lynch Reply Decl.

If that were not enough, the Court can look at the creation of the ledger by way of the

- 5 -

TAS Agreement, the 48 further references to credits and debits therein, the several enrollment agreements that Chenensky executed and N.Y. Ins. Law § 4228, which caps the percentage of premiums paid to an agent as commissions on any insurance policy sold.[4] Chenensky offers no facts to refute that he fully agreed with how New York Life would pay him.

The commonality of facts between Pachter and this case is overwhelming. The only "superficiality" that can be found is in Chenensky's weak attempt at immaterial distinctions.[5]

### D. Chenensky's Argument That He Signed The Expense Enrollment Agreements After His Agent Contract And TAS Agreement Is A Red Herring.

Despite contradicting his sworn testimony, Chenensky argues that because he signed certain enrollment agreements after he entered into his Agent Contract and TAS Agreement, those enrollment agreements cannot reflect his compensation understanding.[6] The absurdity of that argument first can be found in the TAS Agreement itself, which expressly creates the ledger for the purpose of posting both credits and debits, which Chenensky acknowledges included expense debits. Chenensky dep. 211:12-213:7, Exh. B to Lynch Reply Decl. Similarly, the TAS Agreement, as mentioned, otherwise refers 48 times to credits and debits. SOF ¶ 5. In short, the earlier agreements Chenensky signed reflected that, later, other agreements might be signed that would work in tandem with the TAS Agreement.

---

[4] Chenensky does not address the applicability of Insurance Code Section 4228 in his Opposition Memorandum. And that is because the unavoidable reality is that, under New York Law, a contract that rendered advanced commission credits irreversible, even if not all premiums are received, would be illegal. See Restatement (Second) Contracts § 203(a) (interpretation giving a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect).

[5] Chenensky also argues that Pachter differs because Pachter did not face personal liability to make payments to Hodes if her debits were greater than the credits on her ledger. But there is no evidence noted in Pachter suggesting that Pachter would not have had such personal liability to Hodes if she terminated with a negative ledger balance or if her commissions for a month were less than her "Charges." The only evidence on that point is an understanding that she had to pay for "Bad Debts." And, in any event, there is no suggestion in any opinion of either the federal or state courts that decided Pachter that this issue even was relevant.

[6] Chenensky's argument that New York Life had to specifically integrate his patchwork of agreements into one document for them to be part of his compensation arrangement is wrong. (Pl. Br. p. 9). But see, e.g., Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 572 (2d Cir. 1993) ("Under New York law a written contract may be formed from more than one writing. Relevant writings creating a contract may consist of letters bearing the signature of only one party or even memoranda unsigned by either party.") (citations omitted).

As if that were not enough, Chenensky ignores that he attended a pre-hire "**compensation** interview" where he learned that he would have the opportunity to enroll in various programs at different stages of his affiliation and that he would incur expenses through such enrollments. Chenensky dep. 145:25-148:7, Exh. B to Lynch Reply Decl. Chenensky's preserved notes from that compensation interview are replicated here:

[Handwritten notes image: Expense allowance lunches / see next page / @ F/T ① Phone / Coyote assistant / mth 0-4 $40 unlimited / 5-12 24 mth + 50% of Bill / 13→ 24 mth + 100% of Bill / ● Tech Center Fee (Kinkos) / $35 mth / IF Join ● Field technoly - software / access to cheats + Illustrations / 5th or 6th month $60 mth optional / ● OFFICE - pay rent]

Exh. D to Lynch Reply Decl.[7] The reason that Chenensky did not sign those agreements at the same time as his Agent Contract and TAS Agreement is because not all agents uniformly enroll in every program and they only enter them when they either are required or choose to do so.

### E. Defendants' Position Comports With The Parties' Course of Performance.

The Court need look no further than the parties' patchwork of written agreements, especially as corroborated by Chenensky's own testimony, to enter summary judgment. Nonetheless, New York Life is mindful of this Court's prior references to ambiguity in those agreements. That finding of ambiguity, however, related solely to the question of when individual commission credits were earned – not to whether the parties agreed that *compensation* would include negative adjustments applied to, or subsequent reversal of, such credits.

---

[7] His compensation interview notes show that he would enroll for telephone services at full-time "F/T" and incur field technology expenses (noted as "optional") in his "5th or 6th month." Chenensky dep. 145:25-148:7, Exh. B.

Nonetheless, should the court remain concerned about any such ambiguity, the next step is to evaluate extrinsic evidence, starting with the parties' course of performance.  JA Apparel Corp., v. Abboud, 682 F.Supp.2d 294, 303 (S.D.N.Y. 2010) (if ambiguity requires consideration of extrinsic evidence, court must look to all surrounding facts, including any relevant course of performance, course of dealing, usage of trade and a party's own admissions); New Windsor Vol. Ambulance Corps, Inc. v. Meyers, 442 F.3d 101 (2d Cir. 206) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.").

That course of performance only further confirms that Chenensky fully understood his compensation arrangement and that New York Life paid him all that he was due:

- New York Life paid him the net balance on his ledger each pay period (Dkt. #158, ¶ 15);
- He had 24/7 ledger access to see the rolling reconciliation of credits and debits (Id., ¶ 26);
- He received for 76 pay periods printed ledger statements reflecting the credits and debits applied to his ledger and the net compensation amount paid to him (Id. ¶ 26);
- He accepted the compensation amount on his ledger statement each payday (Id., ¶ 26); and
- He never complained about New York Life's practice of reconciling his debits against the balance on his ledger to determine his periodic compensation (Id., ¶ 28).

That evidence confirms the parties' understanding that debits were part of determining periodic compensation and that the parties acted with that understanding for years.  Those facts and Chenensky's admissions are dispositive of the issue before the court, rendering the rule of *contra proferentem* inapplicable.  See Adasar Grp., Inc. v. Netcom Solutions Intern., Inc., No. 01-0279, 2003 WL 1107670 at *7 (S.D.N.Y. Mar. 13, 2003) (Pauley) (*contra proferentem* "does not apply where, as here, the extrinsic evidence is dispositive.") (citations omitted).

Finally, Chenensky's assertion that New York Life's acquiescence argument would broaden Pachter's holding so far that it would "for practical purposes swallow § 193 whole" is

- 8 -

wrong and hyperbolic.  First, that argument really is nothing other than an effort to re-litigate Pachter, which is from where the reference to "acquiescence" derives.  Second, the holding in Pachter relates solely to commission-based compensation, where an employer and employee can agree that compensation includes downward adjustments to commission credits.  It has no application in the context of a salaried or hourly employee – where the employee is entitled to a fixed sum determinable solely by reference to the amount of time worked.  Third, courts only look to the parties' course of performance (and, particularly, employee acquiescence) in the absence of a clear, unambiguous compensation agreement.  Fourth, for acquiescence to carry the day, there must be proof, as here, that the employee accepted the compensation system for an extended period without complaint.  In sum, the Court should not be swayed by Chenensky's desperate exaggeration of the potential ramifications of Pachter.

### F. Chenensky's Tax Treatment And Debt Recompense Arguments Do Not Preclude Summary Judgment To New York Life.

Chenensky again makes much ado about how Hodes withheld taxes based on Pachter's net income (post-reconciliation) while New York Life withheld based on the credits showing on the ledger.  Notably, however, the only reason that fact is known is that in his exhaustive quest for any possible distinction between the facts in this case and Pachter, Chenensky combed the Pachter record to ascertain how Hodes withheld taxes.  While that search certainly reflects zealous advocacy, the fact remains that none of the opinions in Pachter – state or federal – even mention tax treatment of Pachter's commissions, let alone find it dispositive as Chenensky now argues.  In short, the tax treatment issue is immaterial to the analysis.

Even if tax treatment mattered, however, whether income is "gross income" or "wages" for purposes of the Internal Revenue Code ("IRC") has nothing to do with the Pachter analysis or whether wages are "earned" under New York Labor Law § 193.  Indeed, if there were an

express, single integrated contract identifying all components (credits and debits) of Chenensky's compensation and specifying that New York Life and Chenensky agree that his compensation would be the net of credits and debits on his ledger, Chenensky could not be heard to argue that the tax treatment altered his agreement. In short, while a clever legal argument, Chenensky's lawyers ignore that Chenensky admittedly understood his compensation would be determined by netting credits and debits, with the mechanics of tax withholding having no bearing whatsoever.[8]

In addition, Chenensky's argument that the "lien" language in his Agent Contract and TAS Agreement and the practice of seeking recompense for negative ledger balances[9] somehow altered his compensation understanding is specious.[10] In this regard, Chenensky clings to this Court's prior statement that, "[b]y placing a lien on compensation that is payable, New York life appears to be debiting monies already earned." (Pl. Br. p. 11). But that remark was part of a discussion focused on when individual commission credits were considered earned. The Court's later holding that the time of commission crediting is immaterial to the question of when "compensation" is earned renders that prior observation immaterial now. Recognizing that the parties can agree that payable commission credits are subject to downward adjustments as part of calculating periodic pay, the lien provision is of no consequence.

## III. CONCLUSION

For all of the above reasons, New York Life respectfully requests that this Court grant New York Life's Motion for Summary Judgment and dismiss all claims herein.

---

[8] In addition, the IRC and NYLL § 193 are different statutes with different requirements animated by distinct purposes. How commission credits are treated under the former has no bearing on the application of the latter.

[9] Chenensky's suggestion that New York Life pursues agents for expense debits is misleading. The collection efforts focus on "negative ledger balances" which may be comprised of commission reversals and/or expense debits – a fact illustrating that the entries on the ledger are an integrated part of the compensation arrangement.

[10] In any event, it is undisputed that New York Life maintains a procedure whereby it may seek reimbursement from agents for amounts overpaid through the ledger system to comply with the limits imposed by N.Y. Ins. Law § 4228 and to shield against scams by opportunistic agents. That practice is lawful. More importantly, these arguments do not explain away the fact that Chenensky expressly agreed to the ledger-based compensation system pursuant to he was paid during the entirety of his tenure.

- 11 -

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: s/ Sean P. Lynch

| | |
|---|---|
| Richard G. Rosenblatt (pro hac vice) | Michael L. Banks (pro hac vice) |
| Sean P. Lynch | MORGAN LEWIS & BOCKIUS LLP |
| 502 Carnegie Center | 1701 Market Street |
| Princeton, New Jersey 08540 | Philadelphia, Pennsylvania 19103 |
| Phone: (609) 919-6600 | Phone (215) 963-5387 |
| Fax: (609) 919-6701 | Fax (215) 963-5001 |
| rrosenblatt@morganlewis.com | mbanks@morganlewis.com |
| slynch@morganlewis.com | *Counsel for Defendants* |

January 29, 2013